IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. TDC-21-129 |
| BRUCE THOMAS, | : | |
| Defendant. | : | |

...oooOooo...

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its counsel, Jonathan F. Lenzner, Acting United States Attorney for the District of Maryland, and Harry M. Gruber and Dana J. Brusca, Assistant United States Attorneys for said District, hereby submits its Sentencing Memorandum in the above-captioned case.

For the reasons set forth below, the government respectfully requests that this Court sentence the defendant to a year and a day in prison, followed by three years of supervised release, restitution of $27,890.62, a fine of $50,000, and a special assessment of $100. The government submits that this sentence is a reasonable and appropriate punishment, pursuant to the sentencing factors articulated in 18 U.S.C. § 3553(a).

The Offense of Conviction

From approximately 2012 to 2019, Defendant Bruce Thomas ("Thomas" or "Defendant"), operated a very successful business, Pinnacle Orthopedic Services, Inc. ("Pinnacle"), which was operated out of his residence in Germantown, Maryland. During this time, Pinnacle provided orthotic and prosthetic materials to the Prosthetics and Orthotics Department at Walter Reed National Military Medical Center ("Walter Reed"). Pinnacle primarily purchased the materials that it sold to Walter Reed from other companies located throughout the United States. Many of

those companies sought to establish direct relationships with Walter Reed, and provide materials directly to Walter Reed, but were denied the chance to do so until after the government's criminal investigation became public.

During this time, Walter Reed played a critical role in the U.S. military's ability to fight foreign conflicts, primarily by providing medical services to active duty injured soldiers, including prosthetic and orthotics services. Walter Reed also provided other medical services.

During the five year period 2012 to 2017, Thomas knowingly provided gratuities to a public official, David Laufer, for and because of official acts by Laufer. Thomas stipulated in his plea agreement that he "provided Laufer with cash gratuities on a regular basis amounting to at least $20,000." ECF No. 12 at 12. Thomas also stipulated to providing Laufer with numerous non-cash gratuities, including "airline travel, lodging, entertainment tickets," "food, drinks, and other benefits." *Id*. at 11-12.

Pursuant to these gratuities, Thomas and Laufer went on trips together to California, Boston, Las Vegas, Atlantic City, and on at least three different occasions to Florida. Some of the trips were related to professional training. However, many of the trips were unabashed boondoggles. To give the Court a sense of the trips, on one visit to Florida, Laufer and Thomas took a factory tour of Grace Prosthetic Fabrication, Inc. ("Grace"),[1] a Florida company from which Pinnacle purchased a large amount of prosthetics and orthotics. Other than a brief tour of Grace, the rest of the trip was pretty much occupied with entertainment and enjoyment, including meals, drinking, and visits to adult entertainment venues.[2]

---

[1] At one point, Grace was selling more than $200,000 a month of products to Walter Reed through Pinnacle, and Walter Reed represented Grace's largest end user.
[2] On another trip to Tampa, Laufer and Thomas met with one of Grace's owners, but did not visit Grace. Grace typically received orders directly from Walter Reed, and shipped the products direct to Walter Reed. Pinnacle would handle the billing.

In March 2015, Thomas also paid for Laufer and his wife to travel first class to Las Vegas for their anniversary. This trip didn't even have a purported business reason.

Laufer never sought permission to take the trips as official government travel, took annual leave for the trips paid for by Thomas, and neither Laufer nor Thomas informed Walter Reed higher-ups about the trips. Laufer also never declared the trips on his required annual government disclosure forms (OGE 450/OGE 450A).

Laufer was the Chief of the Prosthetics and Orthotics Department at Walter Reed and regularly interacted with Thomas on behalf of the government. Among other official acts, Laufer consistently caused government funding to be allocated to Pinnacle through a government contracting method called a Blanket Purchase Agreement ("BPA"), and repeatedly approved Walter Reed's orders for prosthetic and orthotic materials from Pinnacle. ECF 12 at 12. The Information and factual stipulation set forth in detail how Laufer repeatedly undertook official acts while he was being provided with gratuities, and how these official acts kept resulting in significant funds flowing to Pinnacle and Thomas. During the time period 2012 to 2019, more than $20 million of government funds were paid to Pinnacle. *Id*. at 10.

As time went on, Laufer could not spend the cash Thomas was providing to Laufer, and Laufer deposited significant amounts of cash into his bank accounts. Law enforcement detected Laufer's unusual cash deposits. Over time, agents repeatedly questioned Laufer about the sources of this cash, and Laufer repeatedly denied that the cash came from Thomas. *United States v. Laufer*, No. TDC-19-593, ECF 39 at 13. After the search warrants, Laufer confided to Hamilton that he would never admit the cash. Eventually, Laufer (and later Thomas) admitted that the cash consisted of gratuity payments from Thomas. Thomas specifically admitted in his plea to paying Laufer more than $20,000 in cash gratuities and providing numerous other non-cash gratuities. ECF 12 at 11-12.

As Thomas paid gratuities and Laufer continued to accept them, Laufer "restricted the availability of the BPAs to some of the manufacturers and distributors from whom Pinnacle purchased products, thereby inhibiting those companies from doing business directly with Walter Reed." ECF No. 12 at 13. Laufer also directed "multiple manufacturers and distributors to sell to Walter Reed through Pinnacle." *Id*. This caused Walter Reed to pay more money than it would have paid to the original manufacturers and distributors because Pinnacle's price to Walter Reed included Pinnacle's markup.

Law enforcement executed multiple search warrants in connection with the criminal investigation into the activities of Thomas, Laufer, and others. As the warrants were being executed, federal agents spoke with Thomas. During the interviews, Thomas admitted to law enforcement that the items he sold were typically marked up between 40 and 50 percent over the manufacturer suggested retail price. Thomas stated that Pinnacle's yearly gross income was $3-5 million, and that Walter Reed accounted for approximately $3-4 million of that income.

Unfortunately, Thomas also was not truthful with the agents. He denied—contrary to his plea agreement's factual stipulation—that he ever paid Laufer cash. He denied providing cash to Laufer despite repeated questions from the agents about Thomas' use of cash. Moreover, contrary to his guilty plea, Thomas also denied providing hockey tickets to any government employee. Regarding the trips, Thomas falsely claimed that each person paid their own way on the trip to Tampa, Florida.

As a result of his special relationship with Walter Reed, which primarily accounted for the profits of Pinnacle during the time periods covered by Thomas' plea, Thomas made significant amounts of money. The presentence report details Thomas' significant assets, including two residences collectively valued at more than $1 million, and trading accounts valued at more than

$3 million. The Thomas family obtained most of its income over the last decade from Pinnacle,[3] and they have a net worth of more than $4.5 million. ECF 19 at 13 (Presentence Report).

The Advisory Sentencing Guidelines Calculation

The plea agreement contemplated a dispute between the parties regarding the amount of cash provided by Thomas to Laufer. Recognizing the additional discovery, sentencing testimony, and potential issues raised by this factual dispute, the government has determined that it will ask this Court to sentence Thomas solely on the basis of the guidelines calculation that he admitted in his plea agreement. This only results in a one point decrease in the final offense level, and a difference of only three months in the advisory federal sentencing guidelines range.[4]

Accordingly, based on the stipulations by Thomas in the plea agreement, the government submits that the following advisory sentencing guidelines calculation at sentencing should be undisputed:

Base Offense Level = 9 (§2C1.2(a)(2))

Adjustment Based on multiple gratuities: +2 (USSG §2C1.2(b)(1))

Adjustment based on value of the gratuity: +4 (USSG §§ 2C1.2(b)(1), 2B1.1(b)(1)(C))

Acceptance of Responsibility: -2 (USSG § 3E1.1(a))

Final Adjusted Offense Level: 13

---

[3] Thomas' wife also worked for Pinnacle during these crimes. Thomas' wife told federal agents on March 28, 2017 that she worked as President of Pinnacle Prosthetic Labs ("PPL"), and the co-owner/administrator of Pinnacle. Her duties touched on many aspects of Pinnacle's relationship with Walter Reed, including billing, orders, invoicing, and the entering of information in QuickBooks. She also told federal agents that Pinnacle and PPL did not use cash and that she was unaware of any improper relationships with government employees.

[4] As set forth in the presentence report, based on a loss of $40,000-90,000, consisting of cash payments from Thomas to Laufer, plus the non-cash gratuities, such as airfare, dinners, and other benefits, the offense level before acceptance of responsibility would be 17, resulting in a final offense level of 14, and an advisory range of 15-21 months' incarceration. Due to the acceptance of responsibility rules, as set forth in USSG § 3E1.1, the final advisory guidelines range under Thomas' stipulated loss amount would be 12-18 months' incarceration.

This results in an advisory sentencing guidelines range of 12-18 months' incarceration. Pursuant to USSG § 5E1.2(c)(3), based on the above guidelines calculation, the Court is authorized to impose a fine between 5,500 and $55,000.

<u>The Government's Sentencing Recommendation</u>

The government's proposed term of incarceration would constitute a reasonable sentence pursuant to 18 U.S.C. § 3553(a), and the Supreme Court's decision in *Gall v. United States*, 552 U.S. 38, 51 (2007). It is necessary based on "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need to "to promote respect for the law," and the need for both specific and general deterrence. 18 U.S.C. § 3553(a).

The criminal conduct here was serious, long lasting, and harmful. Thomas provided illegal gratuities to Laufer on a regular basis for *years*. This was not a quick crime that constituted a momentary loss of good judgment. Instead, Thomas' crimes were well considered and carried out repeatedly. Moreover, it is apparent that Thomas' motivation for rewarding Laufer for official acts stemmed from Thomas' desire for profit and business success. At its core, both Thomas and Laufer were governed by greed.

The illicit relationship between Thomas and Laufer infected the core operations of the prosthetics and orthotics department at Walter Reed. Although the government does not contend that the gratuities impacted the care of Wounded Warriors and others, it certainly impacted the cost of that care to the federal government. Other employees of the Department recognized and spoke about Pinnacle's special relationship with Laufer/Walter Reed. Pinnacle's relationship with Walter Reed and Laufer certainly lined Thomas' pockets for years. Thomas talked to the agents about the significant markups that Pinnacle charged, and how Walter Reed was the source for much of Pinnacle's cash flow. Providing financial thanks to Laufer for doing official government acts related to Pinnacle is a classic form of government corruption, and Thomas knew better.

It is very difficult for the government to detect the type of sly, underhanded corruption that occurred in this case. And after detection, it is even more difficult to prove a crime beyond a reasonable doubt. Therefore, the government submits that it is important to send a message by imposing a significant period of incarceration to specifically deter Thomas from future crimes, and more importantly, deter all the other government contractors and corrupt government officials, and to promote respect for the law.

Furthermore, the government submits that it is important to consider Thomas' reaction when the government investigation became known to Thomas. As detailed above, Thomas denied his cash gratuities and obfuscated regarding several relevant facts. With respect to the benefits that Thomas eventually admitted providing Laufer, Thomas falsely denied to agents that the benefits had any connection to Laufer's official government acts. It was not until much later, after additional investigation involving interviews, grand jury testimony, and voluminous subpoena responses, that Thomas finally acknowledged his criminal activities.

The government submits that these corrupt acts pose a significant danger to good government, and that Thomas repeatedly made a decision to undercut the function of good government through many gratuities, including cash payments. This was not an oversight or accident on Thomas' part. It was serious criminal conduct that requires a serious period of incarceration. Nevertheless, the government recognizes that Thomas timely accepted responsibility for his criminal conduct, and that his own history and personal characteristics are a mitigating factor.[5] Accordingly, the government submits that a sentence of one year and one day is a reasonable sentence.

---

[5] The government recognizes that Thomas has a limited prior criminal history, and that his prior encounters with the legal system all appear alcohol related.

Restitution, Forfeiture & Fine

In his plea agreement, Thomas stipulated to the imposition of restitution and forfeiture orders between $15,000 and $90,000. ECF No. 12 (¶¶ 11, 16). The parties further agreed that the amount of forfeiture should be equal to the value of the property involved in the Defendant's offense. ECF No. 12 (¶ 11).

In the factual stipulation, Thomas admitted to paying Laufer "cash gratuities on a regular basis, amounting to at least $20,000 in total," and admitted to a number of specific non-cash gratuities. ECF No. 12 at 11-12. In the plea agreement, Thomas stipulated to a specific list of non-cash gratuities, ECF No. 19 (¶ 21), which had a value of $7,890.62. Accordingly, the government asks this Court to impose restitution and forfeiture in the amount of $27,890.62.

The government submits that a $50,000 fine in this case is necessary and appropriate pursuant to 18 U.S.C. Section 3553(a). The presentence report demonstrates that the Defendant has the ability to pay a fine, and that a fine is an appropriate sentencing option. ECF 19 at 13-14. Thomas' crime stemmed from gratuities related to Thomas' profitable company, Pinnacle, and was motivated by financial gain.

## CONCLUSION

Accordingly, the government respectfully requests that this Court sentence the Defendant to one year and one day in prison, three years of supervised release, and a fine of $50,000, and impose forfeiture and restitution of $27,890.62, and a special assessment of $100.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By    _____/s/_____
Harry M. Gruber
Dana J. Brusca
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing filing was served on counsel for the defendant by filing in the Court's electronic filing system and by email.

                                                        /s/_____
                                                        Harry M. Gruber
                                                        Assistant United States Attorney