IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. TDC-21-0129 |
| | **)** | |
| **BRUCE THOMAS** | **)** | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT BRUCE THOMAS' MEMORANDUM
IN AID OF SENTENCING**

**BARNES & THORNBURG, LLP**
William R. Martin
Adeyemi O. Adenrele
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006

*Counsel for Bruce Thomas*

I. **INTRODUCTION**

This memorandum is submitted to assist the Court in the fair and just sentencing of Mr. Bruce Thomas ("Mr. Thomas"). On May 14, 2021, Mr. Thomas pled guilty to one-count charging him with Gratuity Paid to a Public Official in violation of 18 U.S.C. § 201(c)(1)(A). The information contained in this Sentencing Memorandum is intended to supplement the Presentence Report ("PSR") and provide the Court with additional information relating to Mr. Thomas, his offense, and how this matter has impacted and changed Mr. Thomas' life. As discussed more fully below and opposed to the Government's characterization of him, Mr. Thomas is the central figure and reliable source of guidance and support in his family. Beyond his two children, he is directly responsible for his surviving disabled brother, his wife's nephew, and other members of his immediate family. Moreover, he has served as a mentor to elementary, high school, and college students who admire him for his commitment to help those that are less fortunate than himself.

Mr. Thomas understands and appreciates the criminal justice system and recognizes that he must be sentenced for his conduct and participation in this crime. Nonetheless, he asks that the Court consider all of the information contained in his sentencing memorandum to aid in determining a just sentence, not for this crime, but for the individual who will be before you. It is our hope that upon considering all of the sentencing factors, and understanding the person standing before this Court, the Court will agree that a sentence of probation is appropriate.

## II. PERSONAL AND PROFESSIONAL BACKGROUND

### a. Mr. Thomas was born into a working class family that taught him the importance of hard work, business ownership, and community service.

"[Mr. Thomas] has always believed in hard work, integrity, and good will towards others." Ex. A, *Character Letter from Jacqueline Thomas*. Born on June 6, 1967 in Bethesda, Maryland, Mr. Thomas is the youngest of four full siblings and two half siblings. His family has lived in Maryland for Mr. Thomas' entire life: first in Poolesville, Maryland and later in Damascus, Maryland. Mr. Thomas' parents both worked hard to provide opportunities to their children. Despite being born into the racial segregation of the 1920s and being an amputee, Mr. Thomas' father, John Thomas, founded D&M Disposal, Inc. ("D&M") in or around the 1960s. As a minority-owned business, John Thomas was able to grow D&M to the point at which it had the requisite resources to successfully contract with Montgomery County for waste collection. Mr. Thomas assisted his father with D&M throughout the earlier parts of Mr. Thomas' life. While in high school, Mr. Thomas learned to balance his school work with his duties at D&M which often included resolving maintenance issues with the garbage trucks. Separately, Mr. Thomas' mother was a school cafeteria worker. As such, she knew and helped care for many of the children in their neighborhood.

Mr. Thomas' family was a well-known staple in their neighborhood. Being raised in that household, Mr. Thomas internalized the business ethic of providing top-notch service to all customers and the importance of treating customers as he would like to be treated. Moreover, he understood that even as a private business, it is critical to be of service to the community.

      **b. Mr. Thomas Continued to Prioritize Community Service in College and as a Post-Graduate and Current Member of a Nationally Recognized and Respected College Fraternity.**

Armed with the lessons from his parents, Mr. Thomas graduated from Damascus high school in 1985 and immediately continued to obtain his post-secondary education. First, he attended Montgomery Community College majoring in Business. After spending two years there, he applied to and was accepted as a transfer student to Towson University. He graduated from Towson University in 1990 with his Bachelor of Science degree in Business Administration. Mr. Thomas is the first person in his family to attend and graduate from college.

Importantly, while at Towson University, Mr. Thomas joined the Kappa Alpha Psi Fraternity, Inc., a community service oriented African-American fraternity. Kappa Alpha Psi, as with all historically Black fraternities and sororities, was created at a time when African Americans were completely ostracized or not allowed at all on predominantly white college campuses. For that reason, local Kappa Alpha Psi chapters focus on "community outreach activities to feed the homeless, provide scholarships to young people matriculating to college, serve as mentors to young men, participate in blood drives and serve as hosts of seminars for public health awareness . . . ." Kappa Alpha Psi Fraternity, Inc., https://kappaalphapsi1911.com/page/History (Last visited August 22, 2021).

To this day, Mr. Thomas continues to be an active member with the Gaithersburg-Rockville Alumni Kappa Alpha Psi Chapter which he helped to establish in Montgomery County, Maryland. *See* Ex. B, Character Letter from Colonel Ted M. Bryant; *see also* Ex. C, Character Letter from Paul Hagans. Mr. Thomas volunteers on the Scholarship Committee and helps his Kappa Alpha Psi alumni chapter to host black tie dinner galas to raise thousands of dollars in scholarship money for deserving and aspiring college students from Montgomery County. *See.* Ex. B. Additionally, Mr. Thomas has participated for several years in Kappa Alpha Psi's mentoring

program, Guide Right. Guide Right is designed to help young middle school male students grow, receive, and develop their leadership talents and become productive members of society. His mentoring extends also to the Brotherhood of Superstars ("BOSS") program. Different from the Guide Right program, BOSS assists high school students with leadership and life skills at Watkins Mills High School in Gaithersburg, Maryland. *See* Ex. D, Character Letter from Elbridge G. James. Mr. Thomas mentored high school students through the BOSS program for over ten (10) years. Additionally, Mr. Thomas makes regular donations to worthy causes, including donations of food and clothes annually to the Helping Hands Women's Shelter, monetary donations to St. Jude's Hospital, donations of clothes and toys to the National Center for Children and Families, as well as assisted in the collection and distribution of bicycles to children in the country of Togo. Mr. Thomas engaged in all of these community service projects and mentoring opportunities as a result of his membership in the fraternity. His commitment to community service is also a direct result of the lessons he learned from his parents.

### c. Mr. Thomas Enters the Orthotics and Prosthetics Sales Industry and His Client-Centered Approach Leads Him to Consider Starting His Own Business.

After graduating from college, Mr. Thomas returned to Damascus, Maryland where he worked several jobs, at times, simultaneously for two years. During that time, he continued to assist his father with D&M but Mr. Thomas also sold insurance and was a District Court of Maryland Commissioner. After working as an insurance salesman, Mr. Thomas finally decided to try his hand at selling orthotics and prosthetics. Mr. Thomas was aware of the issues and struggles that his father encountered as an amputee and how vital high quality prosthetics were critical to regaining normal bodily functions. Thus, Mr. Thomas believed that entering the orthotics and prosthetics industry would be the best way for him to continue to be of service to his community and help those in need.

In or around 1997, he joined a company called DeRoyal Industries and began selling orthotics near Knoxville, Tennessee. Mr. Thomas mainly sold knee braces and wrist splints. Then, DeRoyal had a small account with Walter Reed. Mr. Thomas worked with DeRoyal for a decade. During that time, not only did Mr. Thomas learn the details of the industry but also understood the mistakes of DeRoyal. Mr. Thomas, ultimately, decided to leave DeRoyal and join OrthoCare Solutions in 2007. From 2007 to 2010, Mr. Thomas worked as an independent contractor with OrthoCare. However, while at OrthoCare, Mr. Thomas continued to yearn to start his own orthotics and prosthetics sales business. He analyzed the failures of his potential competitors and believed that he could serve those clients' needs in a more streamlined fashion.

### d. Mr. Thomas Opens Pinnacle Orthopedic Services to Better Support His Immediate and Extended Family as well as to Serve the Public.

Though he was an important asset to OrthoCare Solutions, Mr. Thomas still understood the importance of starting his own business to support his family, like his father. Importantly, just the year before starting at OrthoCare, Mr. Thomas married his soulmate, Jacqueline Kerr ("Mrs. Thomas"), on April 22, 2006. Mrs. Thomas supported and provided further motivation for Mr. Thomas to start his own orthotics and prosthetics business.

With his wife's encouragement, Mr. Thomas founded Pinnacle Orthopedic Services, Inc. ("Pinnacle") in 2010. Pinnacle is a Maryland S-Corporation that sources, stores, and distributes orthotic and prosthetic devices to its clients. Pinnacle operates as a "one-stop-shop." Instead of Pinnacle's clients having to source each orthotic or prosthetic part, they can simply communicate their needs to Pinnacle which will find the appropriate manufacturer, purchase the requested part from that manufacturer, and resell the part to the client. At Walter Reed, the ultimate end-users of the products sourced by Pinnacle are wounded returned war veterans. Mr. Thomas was directly involved in measuring and fitting the devices to ensure that these soldiers can regain their mobility.

As used in many industries, this distributor model is important and, often, saves clients time and money. The distributor acts as an intermediary between its clients and the manufacturers. The clients are able to outsource to the distributor, at a lower cost, the expense of the laborious process of contacting different manufacturers for each type of product needed, billing each manufacturer, organizing and monitoring the shipping logistics, and hiring full time employees to manage this process. This procedure was in place at Walter Reed prior to Pinnacle beginning to do business there and this process is still utilized today. Using this model, Pinnacle slowly began to grow.

During the same time that Mr. Thomas was beginning his business, he and his wife began growing their family. First, the couple had two beautiful children: one daughter (currently 12 years old) and one son (currently 9 years old). Next, in 2012, Mrs. Thomas' mother, Joyce Kerr ("Ms. Kerr"), encountered dangerous health issues as a result of her older age. Mr. and Mrs. Thomas decided to bring Ms. Kerr into their household. At that time, Ms. Kerr had been raising her grandson, Terrance Lans ("Terrence"), since his birth. Though, the Thomas' were initially reluctant to also allow Terrence to live with them, Mr. Thomas felt it was necessary and important for Terrence to live in a stable household with a positive male role model. *See* Ex. A; *see also* Ex. E, Character Letter from Clifford Brown. As a result of Mr. Thomas' guidance, Terrence now attends Mr. Thomas' alma mater, Towson University.

Despite being the youngest sibling, Mr. Thomas was further thrust into a leadership role for his entire family. "He has been the rock of the family." Ex. A. All of his male siblings suffered from heart conditions that have either debilitated them or led to an untimely death. First, both of Mr. Thomas' older half-siblings died due to heart-related issues. These were the oldest siblings in his immediate family. Mr. Thomas keeps in frequent contact with his surviving siblings who all

reside in Maryland. However, the next eldest brother is disabled after suffering a stroke six years ago. Mr. Thomas, now, also assists in caring for his disabled brother. Further, Mr. Thomas plays a supportive role for his sisters, their children, and grandchildren. *See* Ex. F, Character Letter from Therese Thomas, Mr. Thomas' Sister.

With all of these responsibilities, Mr. Thomas recognized since the founding of Pinnacle that the success of his family was dependent on the success of Pinnacle. This is still true to this day. As one of the few black-owned businesses in the industry, Mr. Thomas worked to expand Pinnacle since its inception. *See* Ex. G, Character Letter from Frank Griffin. By doing this work and putting his clients' needs first, Mr. Thomas was able to expand his business rapidly. As one of the few successful minority business owners in this space, Mr. Thomas is not only a vital part of this industry but, more importantly, to his family.

### III. MR. THOMAS RESPECTFULLY REQUESTS THAT THIS COURT SENTENCE HIM TO PROBATION.

As a preliminary matter and as mentioned above, Mr. Thomas pled guilty to one-count charging him with a Gratuity Paid to a Public Official in violation of 18 U.S.C. § 201(c)(1)(A). Between 2012 and 2017, David Laufer ("Mr. Laufer") was the Chief of the Orthotics and Prosthetics Department at Walter Reed. The vast majority of the trips that Mr. Thomas and Mr. Laufer took together and were referenced in Mr. Thomas' plea agreement were for educational conferences and meetings with manufacturers of orthotic and prosthetic products. Mr. Thomas admitted that he used his remaining American Express credit card points, for the most part, to cover Mr. Laufer's air travel and lodging. Mr. Thomas is not arguing that the use of American Express points diminish his acceptance of responsibility but instead simply wants to explain the form of these expenses. As individuals doing business and traveling together, Mr. Laufer and Mr. Thomas ate meals, had drinks, and enjoyed other forms of entertainment. At times, Mr. Thomas

8

paid for those expenses. As reflected by his guilty plea, Mr. Thomas, now, knows that he should not have paid those expenses.

Indeed, Mr. Thomas' plea agreement stated that he "provided Laufer with cash gratuities on a regular basis, amounting to at least $20,000 in total." (ECF No. 12, Thomas Factual Stipulation). This Court should know that throughout plea discussions, Mr. Thomas and the Government disagreed on the amount of these cash gratuities. However, since the parties were unable to substantiate an amount, Mr. Thomas and the Government agreed to the sum of $20,000 to reach a plea agreement in this case.

### a. Under Statutory Authority, This Court May Decide a Sentence Below the Guidelines Range.

Mr. Thomas received a total offense level of 13 and a Criminal History Category of I. The advisory guidelines range in this case is 12-18 months. This guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by (1) a sentence of imprisonment or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in USSG §5C1.1(e), provided that at least one-half of the minimum term is satisfied by imprisonment, pursuant to USSG §5C1.1(d).

Although the advisory guidelines range is in Zone C and a term of probation is not expressly authorized according to the sentencing guidelines, a term of probation is authorized statutorily for this offense pursuant to 18 U.S.C. § 3561(a). That section states that a defendant found guilty of an offense cannot be sentenced to a term of probation if "(1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. §

3561(a)(1-3). Mr. Thomas has been convicted of a Class E felony which does not expressly preclude probation. Lastly, there are no other pending charges against Mr. Thomas for which he could be sentenced. Thus, pursuant to 18 U.S.C. § 3561(a), he is eligible for probation.

> **b. According to the United States Supreme Court, this Court May Use the 18 U.S.C. § 3553(a) Factors to Sentence Mr. Thomas Below the Guideline Range.**

As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). With the United States Sentencing Guidelines rendered "advisory only," a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. *Kimbrough v. United States*, 552 U.S. 85, 90-91 (2007) (agreeing with *United States v. Booker,* 543 U.S. 220, 244 (2005) and stating that "[*Booker*] instructed district courts to read the United States Sentencing Guidelines as 'effectively advisory' . . . ."). While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration, however." *Gall v. United States*, 128 S. Ct. 586, 597 (2007); *see also Kimbrough*, 552 U.S. at 91 ("the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

In *United States v. Booker*, the United States Supreme Court determined that district courts must consider all of the sentencing factors under 18 U.S.C. § 3553(a) without giving mandatory weight to the sentencing guidelines. *See* 543 U.S. 220 (2005); *see also United States v. Carlton*, 442 F.3d 802, 808 (2d Cir. 2006) (citing *Booker* and explaining that there is "where the Supreme Court significantly altered the federal sentencing regime, essentially by making the federal

sentencing guidelines advisory instead of mandatory."). In determining the minimally sufficient sentence, Section 3553(a) directs sentencing courts to consider the following factors:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant as described in § 3553(a)(1);

(2) The need for the sentence imposed as described in § 3553(a)(2);

(3) The kinds of sentences available as described in § 3553(a)(3);

(4) The sentencing guideline range and any pertinent policy statements issued by the Sentencing Commission as described in § 3553(a)(4) and (a)(5);

(5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct as described in § 3553(a)(6); and

(6) The need to provide restitution to any victim of the offense as described in §3553(a)(7).

18 U.S.C. § 3553(a).

Indeed as mandated by Congress, the fundamental principle of sentencing is that a court "*shall impose a sentence sufficient, but not greater than necessary*" to meet specified sentencing goals. 18 U.S.C. § 3553(a) (emphasis added). Title 18 U.S.C. § 3553(a)(2) states that such purposes of sentencing are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

Moreover, the Supreme Court has specifically ruled that, in balancing the Section 3553(a)

factors, a judge may determine that "in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 552 U.S. at 91; *see also Rita v. United States*, 551 U.S. 338, 381 (2007) (noting that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or 'that' the case warrants a different sentence regardless[.]"). A district court may now vary from the applicable guideline range "based solely on policy consideration, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101.

After a review of the Section 3553 factors below, we urge the Court to impose a below Guideline sentence and sentence Mr. Thomas to a term of probation. A period of confinement is not necessary to accomplish the stated goal of Section 3553(a), determining and imposing a minimally sufficient sentence.

      c. **An Application of the 18 U.S.C. § 3553(a) Factors Weigh in Favor of a Downward Variance.**

            i. **The nature and circumstances of the offense compel a below the guidelines range sentence.**

Mr. Thomas has extreme remorse for his criminal conduct. Though it was a serious crime, it is worth noting that the Government has not alleged that any Walter Reed patients or staff were physically harmed as a result. As someone with veterans and amputees in his family, Mr. Thomas recognizes the importance of service in the armed forces and always understood that his work would assist those men and women upon their return from service. For this reason, he made sure that his products were of the best quality. Tellingly, at no point has the government claimed that the quality of Pinnacle orthopedic and prosthetic products were below standard. To the contrary, Pinnacle greatly assisted the veterans and patients at Walter Reed to obtain the services and devices needed.

### ii. There is no need to impose a sentence of incarceration because the public humiliation of this crime and his federal debarment are an adequate deterrent for Mr. Thomas.

Outside of this instant offense, Mr. Thomas has led an exemplary life and exhibited otherwise outstanding character. *See* Exs. A – K, Character Letters. As shown in the PSR, other than traffic offenses and a DUI many years ago, Mr. Thomas has not been arrested for any criminal conduct. For a man like Mr. Thomas who must consistently display a good example for his family members and community, the public shame of this conviction alone is an incredibly strong deterrent for him to ever consider committing this crime again.[1] Though Mr. Thomas recognizes that the Court must sentence him, he also knows that he will have to deal with the stigma of a felony conviction for the rest of his life. As the Court ruled in *U.S. v. Wulff*, "a felony conviction irreparably damages one's reputation." 758 F.2d 1121, 1125 (6th Cir. 1985). Also, "Sometimes [Courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" *U.S. v. Prosperi*, 686 F.3d 32 (1st Cir. 2012). Thus, we believe this Court may consider the stigma and public humiliation of

---

[1] Mr. Thomas' guilty plea and the allegations of this case have been covered in the national DC-metro news as well as some orthopedic industry and government contract-related outlets. *Orthopedic Company Owner Pleads Guilty to Bribing Former Walter Reed Official*, Bethesda Beat, (last visited Aug. 24, 2021, 10:35 AM), https://bethesdamagazine.com/bethesda-beat/courts/orthopedic-company-owner-pleads-guilty-to-bribing-former-walter-reed-official/; *Owner of Company Providing Prosthetics and Orthotics Materials to Walter Reed National Military Center Pleads Guilty to Federal Charges in Maryland for Paying Gratuities*, Defense Contract Audit Agency (June 1, 2021), https://www.dcaa.mil/Agency-News/Article-View/Article/2640928/owner-of-company-providing-prosthetics-and-orthotics-materials-to-walter-reed-n/; *Pinnacle Orthopaedic Services Owner Pleads Guilty to Bribery,* Becker's Spine Review, (May 19, 2021), https://www.beckersspine.com/orthopedic/item/51812-pinnacle-orthopaedic-services-owner-pleads-guilty-to-bribery.html; *Owner of Pinnacle Orthopedic Services Inc. Pleads Guilty to Federal Charges*, Yahoo News, (May 19, 2021), https://news.yahoo.com/owner-pinnacle-orthopedic-services-inc-170720953.html; *Owner of Pinnacle Orthopedic Services Inc. Pleads Guilty to Federal Charges*, MSN, (May 19, 2021), https://www.msn.com/en-us/news/crime/owner-of-pinnacle-orthopedic-services-inc-pleads-guilty-to-federal-charges/vi-BB1gUQd3; *Owner of Pinnacle Orthopedic Services Inc. Pleads Guilty to Federal Charges*, CBS Baltimore, (May 18, 2021, 8:52 PM), https://baltimore.cbslocal.com/2021/05/18/owner-of-pinnacle-orthopedic-services-inc-pleads-guilty-to-federal-charges/; *Maryland: Bruce Thomas Pleads Guilty for Paying Gratuities*, STL News, (May 18, 2021), https://www.stl.news/maryland-bruce-thomas-pleads-guilty-for-paying-gratuities/446523/.

a felony conviction felt by Mr. Thomas as a mitigating factor that justifies a variance sentence of probation.

Second, Mr. Thomas' own actions which led to this conviction, have ruined his business. On February 2, 2021, both Mr. Thomas and Pinnacle were suspended from future contracting with any agency in the Executive Branch of the United States government. The vast majority of Mr. Thomas' business was with the federal government. Understandably, now that he is suspended from contracting with the federal government, Pinnacle will likely cease being an ongoing business. Mr. Thomas relied on Pinnacle's profit to support his family. Again, he understands that his actions were not only inappropriate; they were illegal. However, he now also has to deal with the fact that he cannot financially support his immediate family, his disabled brother, or donate to the community in the ways that he once did.

> iii. United States Sentencing Commission statistics suggest that to avoid sentencing disparities, this Court should sentence Mr. Thomas below the Guideline range.

The United States Sentencing Commission (the "Commission") does not appear to hold statistics specifically for sentences related to gratuities charges. However, the Commission collects statistics for "Bribery/Corruption." Though the Government has not alleged that Mr. Thomas committed bribery and Mr. Thomas has not pled guilty to bribery, the sentences for bribery and other corruption charges in the District of Maryland may be instructive. Figure 1 shows the percentage of sentences under the guideline range for the District of Maryland from 2015 to 2020.



*Figure 1: District of Maryland Bribery/Corruption Sentences Under the Guidelines Manual and Variances Over Time*

It demonstrates that every year since 2017, this District has sentenced those convicted of bribery or corruption below the guideline range. Importantly, last year, *every* defendant convicted of bribery or corruption was sentenced below the established guideline range. Given that bribery is a far more serious charge than the a Gratuity Paid to a Public Official charge to which Mr. Thomas pled guilty, we submit that he is even more deserving of a below the guideline range sentence and, specifically, probation.

IV. **With COVID-19 Rates Rising and his Personal and Family History of Cardiovascular Illnesses, A Sentence of Incarceration Could Be Fatal to Mr. Thomas.**

As we argue throughout this memorandum, although Mr. Thomas' conduct violated the law, a sentence of incarceration is not warranted. A downward variance which imposes a period of probation and not incarceration is supported by the facts of this case and the law. We also request that this Court consider Mr. Thomas' heightened risk of serious illness or death resulting from COVID-19 is an additional factor weighing against his incarceration. In the context of motions for

15

compassionate release which has been presented to this Court, your Honor has observed that "[t]he COVID-19 pandemic can present extraordinary and compelling reasons to warrant a sentence reduction under certain circumstances, such as where a defendant has a medical or other condition that creates a high risk of death or severe illness from COVID-19 and the defendant is incarcerated at a prison with a particularly high incidence of COVID-19." *United States v. Person*, No. TDC-16-0445, 2021 WL 3634179, at *1 (D. Md. Aug. 17, 2021). Mr. Thomas is diagnosed with hypertension, a medical condition the United States Centers for Disease Control and Prevention ("CDC") has found to be associated with a high risk of developing severe outcomes from COVID-19. *See Underlying Medical Conditions Associated with High Risk for Severe COVID-19: Information for Healthcare Providers,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html (last visited Aug. 23, 2021). He also has a family history of severe cardiovascular illnesses. As previously mentioned, two of Mr. Thomas' half-brothers have died as a result of cardiovascular issues, and Mr. Thomas's older brother is permanently disabled from suffering a stroke six years ago.

In addition to hypertension, the CDC has found that chronic cardiac disease and stroke are factors associated with COVID-19 related death. *Id*. Further, the CDC has found that persons of the male sex, Black persons, and persons age 50 or older are at increased risk to become severely ill from COVID-19. *Id*.; *see also COVID-19 Risks and Vaccine Information for Older Adults,* https://www.cdc.gov/aging/covid19/covid19-older-adults.html (last visited Aug. 23, 2021). As a 54-year-old Black man with hypertension and a family history of cardiac disease, Mr. Thomas has several risk factors, the combination of which put him in significant danger of severe illness or death from COVID-19. This Court has previously found that inmates with a combination of hypertension along with other CDC-identified risk factors are subject to a significant risk of

COVID-19-related issues sufficient to demonstrate the "extraordinary and compelling reasons" that may justify a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). *See, e.g., United States v. Fletcher*, No. TDC-05-0179-01, 2020 WL 3972142, at *3 (D. Md. July 13, 2020) (defendant's various medical conditions, including hypertension, may constitute an "extraordinary and compelling reason" making him eligible for compassionate release); *United States v. Wright*, No. TDC-19-0035, 2020 WL 2571198 (D. Md. May 21, 2020), at *3 (same).

As of August 23, 2021, the pandemic has resulted in 211,730,035 cases of COVID-19 worldwide and 4,430,697 deaths. *See WHO Coronavirus (COVID-19) Dashboard*, *https://covid19.who.int/* (last visited Aug. 23, 2021). In the United States, it has resulted in 37,405,329 cases and 622,459 deaths as of the same date. *See WHO Coronavirus (COVID-19) Dashboard United States of America, https://covid19.who.int/region/amro/country/us* (last visited Aug. 23, 2021). As of August 20, 2021, the United States Bureau of Prisons ("BOP") has 426 federal inmates and 357 staff members with confirmed positive COVID-19 cases nationwide. *See www.bop.gov/coronavirus/* (last visited Aug. 23, 2021). To date, there have been 244 federal inmate deaths and 5 BOP staff member deaths attributed to COVID-19, and a total of 42,679 positive COVID-19 tests of federal inmates. *Id*. This Court has observed that throughout the pandemic, "[i]n light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high." *United States v. Davis*, No. TDC-15-0116, 2020 WL 6785351, at *1 (D. Md. Nov. 18, 2020) (*citing Coreas v. Bounds*, 451 F.Supp.3d 407, 413 (D. Md. 2020)).

To make matters worse, over the past few months the Delta variant of COVID-19 has caused a reversal in the previous downward trajectory of cases and has become the predominant

strain of the virus in the United States. *See Delta Variant: What We Know About the Science,* *https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html* (last updated Aug. 19, 2021). While the availability of vaccines has increased protection against COVID-19, the CDC has noted that the Delta variant is two times as contagious as previous variants and even fully vaccinated individuals may contract the Delta variant and spread it to others. *Id*. The combination of Mr. Thomas' medical risk factors and the pervasiveness of COVID-19 and its Delta variant nationwide and throughout federal prisons would put Mr. Thomas in real danger of severe illness or death resulting from COVID-19 if he were to be incarcerated as part of his sentence. This danger should weigh against his incarceration.

## VI.  CONCLUSION

Mr. Thomas has demonstrated that he is a hard-working individual who is supported by and supportive of his family, friends and community. He has fully accepted his responsibility for this crime and profoundly regrets his actions. However, his misconduct does not define the man who will be standing before you at sentencing. For these reasons, we respectfully request that this Court sentence Mr. Thomas to a term of probation.

Dated:  August 26, 2021                                          Respectfully submitted,

/s/ William R. Martin
William R. Martin
Adeyemi O. Adenrele
BARNES & THORNBURG, LLP
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20006-4623
Telephone: (202) 289-1313
Fax:  (202) 289-1330
billy.martin@btlaw.com
adey.adenrele@btlaw.com

*Counsel for Defendant Bruce Thomas*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of August, 2021, a copy of the foregoing Memorandum in Aid of Sentencing was served via the Court's electronic filing system/ECF on all counsel of record.

*/s/ William R. Martin*
William R. Martin